Jeffrey A. Lake, Esq. (SBN 159234)
Nathan A. Shaman, Esq. (SBN 272928)
JEFFREY A. LAKE, A.P.C.
11650 Iberia Place, Suite 130
San Diego, California 92128
Tel.: (858) 487-5253
Fax: (858) 737-5123
jlake@lakeapc.com
nshaman@lakeapc.com

McDonald "Don" Worley, Esq. (Texas SBN 24003208)
Michelle Eddington, Esq. (Texas SBN 24041034)
MCDONALD WORLEY, PC
1770 St. James Place, Suite 100
Houston, Texas 77056
Tel.: (713) 523-5500
don@mcdonaldworley.com
michelle@mcdonaldworley.com
Pro Hac Vice Applications Pending

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| DIANNA LINDSAY, an individual, and ROBERT LINDSAY, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON, a New Jersey corporation, ETHICON, INC. , a New Jersey corporation, and ETHICON, LLC, a Delaware limited liability company,<br><br>Defendants. | ) | Case No. '13CV1639 JLS BGS<br><br>COMPLAINT AND JURY DEMAND<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Dianna Lindsay and Robert Lindsay hereby allege as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Dianna Lindsay resides within the City of Carlsbad, State of California within the Southern District of California.

2. Plaintiff Robert Lindsay resides within the City of Carlsbad, State of California within the Southern District of California.

3. Defendant Johnson & Johnson ("J&J") is incorporated as a corporation under the laws of the State of New Jersey, and according to its website, the world's largest and most diverse medical device and diagnostics company, with its worldwide headquarters located in New Jersey. At all times relevant, J&J has organized its subsidiary businesses into individual "Business Units" to coordinate the development, manufacture, testing, marketing, promotion, training, distribution, and sale of its pelvic floor repair products. Within J&J there are three sectors: medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostics sector are various Business Units including the "Ethicon Franchise." The Ethicon Franchise was and at all times relevant has been charged by J&J with the design, development, promotion, marketing, testing, training, distribution, and sale of the pelvic floor repair products at issue in this case. The companies that comprise the Ethicon Franchise, including, but not limited to, Ethicon Inc., Ethicon LLC, and Ethicon LTD are completely dominated and controlled by J&J.

///

4. Defendant Ethicon, Inc. is incorporated under the laws of the State of New Jersey as a corporation, is headquartered in New Jersey, and is and at all times relevant was a wholly owned subsidiary of J&J.

5. Defendant Ethicon, LLC is incorporated as a limited liability company under the laws of the State of Delaware and is and at all times relevant was a wholly owned subsidiary of J&J, charged with the manufacture of Ethicon, Inc.'s pelvic floor repair products. Ethicon, LLC's principal place of business is located in San Lorenzo, Puerto Rico.

6. There is complete diversity between the parties because all Defendants reside outside of Plaintiffs' forum jurisdiction. Plaintiffs are seeking damages in excess of $75,000.00 as demonstrated below more fully. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332.

7. This Court has personal jurisdiction over Defendants pursuant to California Constitution, Article VI, § 10, in that at all relevant times, Defendants transacted business within the state of California, Defendants committed acts which resulted in accrual of a court action within California, and Defendants entered into contracts for services to be rendered or for materials to be furnished in California. Venue is properly laid in this district under 28 U.S.C. §§ 1391 (a) and (c) because the substantial part of the events or omissions giving rise to the claim occurred in the Southern District of California.

///

## NOT AN MDL CASE

8. Although an MDL of transvaginal mesh cases against Defendants has been established in West Virginia, this case is not a transvaginal mesh case because the mesh implant at issue here, although used to treat the same conditions as transvaginal mesh, was implanted into the pelvic organ tissues through an abdominal incision. The surgical approach employed distinguishes Plaintiffs' case against Defendants from the requirements of the MDL, which prohibits transfer to the pending MDL in West Virginia.

## FACTUAL BACKGROUND

9. At all times relevant herein, Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and selling such devices, including the Prolene Mesh/Prolene Soft Mesh, Gynemesh, Gynemesh PS, TVT, TVT-Obturator (TVT-O), TVT-SECUR (TVT-S), TVT Exact, TVT Abbrevo, Prolift, Prolift +M, Prosima and other pelvic mesh products unknown at the present. Defendants manufacture, market, advertise, promote, and sell Pelvic Mesh Products worldwide.

10. As a result of the coordinated activities of all Defendants named above, Plaintiff Dianna Lindsay was implanted with a defective pelvic floor repair product. Plaintiff Dianna Lindsay was implanted with PROLENE MESH (the Product) during surgery performed on June 30, 2009.

///

11. Defendants had a legal duty to insure the safety and effectiveness of their pelvic mesh products by conducting adequate and well-controlled studies on their products prior to marketing. Defendants deliberately chose to manipulate the only studies that were conducted on their products and by so doing provided doctors and patients with false and misleading information about the safety and effectiveness of their pelvic mesh products. Furthermore, Defendants made a conscious decision to forego performing studies and creating registries that would have provided doctors and patients in the United States with accurate information regarding the lack of proof of the safety and effectiveness of their pelvic mesh products.

12. Defendants designed, manufactured, packaged, labeled, marketed, sold, and distributed their pelvic mesh products, including the mesh implanted in Plaintiff Dianna Lindsay, giving rise to her claims asserted herein.

13. The Product was implanted in Plaintiff Dianna Lindsay to treat her rectal prolapse, a use for which the Product was designed, marketed, and sold.

14. Due to the Product's defects, Defendants' negligence, and Defendants' breach of express and implied warranties as described herein, Plaintiffs have suffered severe and permanent bodily injuries, significant mental and physical pain and suffering, and economic losses.

15. Defendants sought and obtained FDA clearance to market the Products under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act.

Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to the Product.

16. On October 20, 2008, the Food and Drug Administration ("FDA") issued a Public Health Notification that described over 1,000 complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to Pelvic Mesh Products. Although the FDA notice did not identify the mesh manufacturers by name, a review of the FDA's MAUDE database indicates that the Defendants are manufacturers of the Pelvic Mesh Products that are the subject of the notification.

17. On July 13, 2011, the FDA issued a Safety Communication entitled, "UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." Therein, the FDA advised that it had conducted an updated analysis of adverse events reported to the FDA and complications reported in the scientific literature and concluded that surgical mesh used in transvaginal repair of Pelvic Organ Prolapse was an area of "continuing serious concern." The FDA concluded that serious complications associated with surgical mesh for transvaginal repair of Pelvic Organ Prolapse, were "not rare."

///

///

18. These serious complications include, but are not limited to neuromuscular problems, vaginal scarring/shrinkage, and emotional problems. Many of the serious complications required medical and surgical treatment and hospitalization.

19. The FDA concluded in its Safety Communication that it was not clear that transvaginal repair of Pelvic Organ Prolapse with mesh or repair of SUI with mesh kits are more effective than traditional non-mesh repair of pelvic organ prolapse. Further, the FDA conducted a systematic review of the published scientific literature from 1996-2011 and concluded that based thereon, transvaginal pelvic organ prolapse repair with mesh “does not improve symptomatic results or quality of life over traditional non mesh repair.” The FDA concluded that “a mesh procedure may put the patient at risk for requiring additional surgery or for the development of new complications. Removal of the mesh due to mesh complications may involve multiple surgeries and significantly impair the patient’s quality of life. Complete removal of mesh may not be possible.”

20. The information contained in the FDA's Public Health Notification of October 2008 and the FDA Safety Communication of July 13, 2011, was known or knowable to Defendants and was not disclosed in oral or written communications, direct to consumer advertising in the form of patient brochures, instructions for use, or labeling.

21. In fact, at the time Defendants began marketing each of their Pelvic Mesh Products, Defendants were aware that their Pelvic Mesh Products were associated with

each and every one of the adverse events communicated by the FDA in its July 13, 2011 Safety Communication.

22. In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating, "There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . . . Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable."

23. Defendants knew or should have known about the Product's risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

24. Defendants also knew or should have known that: (1) some of the predicate products for the Pelvic Mesh Products had high failure and complication rates, resulting in the recall of some of these predicate devices (including a medical device known as a Protogen device); (2) that there were and are differences between the Defendants' Pelvic Mesh Products and some or all of the predicate products, rendering them unsuitable for designation as predicate products; (3) that significant differences exist and existed between the Pelvic Mesh Products and their predecessor and predicate products, such that

the disclosures to the FDA were and are incomplete and misleading; and (4) that the Pelvic Mesh Products were and are causing numerous patients severe injuries and complications.

25. The Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, and the patients. As a result, the Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers and patients, into believing that the Pelvic Mesh Products and the procedures for implantation were and are safe and effective, leading to the prescription for and implantation of the Product into Plaintiff Dianna Lindsay.

26. Plaintiff Dianna Lindsay's injuries correspond to complications reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion. Although the mesh was implanted into the pelvic organ tissues through an abdominal incision, the injuries suffered by Dianna Lindsay as a result of her implantation with pelvic mesh are substantially similar to those suffered by women with mesh implants inserted through an incision in the vaginal wall. Pelvic floor disorders, including stress urinary incontinence and pelvic organ prolapse, are common conditions that have a significant negative impact on the well-being and quality of life of women. Stress urinary incontinence and pelvic organ prolapse cause numerous sexual, urinary, and bowel dysfunctions.

27. Pelvic floor disorders can be surgically treated via vaginal or abdominal routes. Pelvic mesh products are commonly implanted to treat prolapse and stress urinary incontinence regardless of the surgical approach employed by the surgeon. The injuries and complications associated with the use of Pelvic Mesh products and described by the FDA are common in all surgical procedures used to treat pelvic floor disorders. They are not specific to surgical treatment via transvaginal incisions.

28. The FDA Safety Communication further indicated that the benefits of using mesh products instead of other feasible alternatives did not outweigh the associated risks.

29. Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the White Paper). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

30. The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it has NOT seen conclusive evidence that using mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk.

31. The FDA White Paper further stated that "these products are associated with serious adverse events . . . . Compounding the concerns regarding adverse events are

performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

32. In its White Paper, the FDA advised doctors to, *inter alia*, "[r]ecognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications."

33. The FDA concluded its White Paper by stating that it has identified serious safety and effectiveness concerns over the use of surgical mesh for the repair of pelvic organ prolapse.

34. Defendants knew or should have known that the Product unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

35. The scientific evidence shows that the polypropylene material from which the Product is made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Product, including Plaintiff Dianna Lindsay. This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff Dianna Lindsay.

36. The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off

unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Product was unreasonably susceptible to degradation and fragmentation inside the body.

37. The Product was unreasonably susceptible to shrinkage and contraction inside the body.

38. The Product was unreasonably susceptible to "creep" or gradual elongation and deformation when subject to prolonged tension inside the body.

39. The Defendants have marketed and sold the Pelvic Mesh Products to the medical community at large and directly to patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, and private offices; they include the provision of valuable cash and non-cash benefits to health care providers. Defendants also utilized documents, patient brochures, and websites to offer exaggerated and misleading expectations as to the safety and utility of the Pelvic Mesh Products. Defendants further engaged in direct-to-consumer marketing specifically designed to drive consumers to seek out these products for implantation into their bodies.

40. At all times relevant to this action, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the risks, dangers,

defects, and disadvantages of the Pelvic Mesh Products and advertised, promoted, marketed, sold, and distributed the Pelvic Mesh Products as safe medical devices when, in fact, Defendants knew that the Pelvic Mesh Products were not safe for their intended purposes and that the Pelvic Mesh Products would cause, and did cause, serious medical problems, and in some patients, catastrophic and permanent injuries.

41. For example, Defendants described in its Patient Brochures, Instructions for Use, and other marketing materials that the known complications for its Pelvic Mesh Products were consistent with any surgical procedure of an implantable medical device and described such occurrences as “rare” and “small” when in fact Defendants knew or should have known that the complications were not rare or small but common, permanent, and debilitating.

42. Defendants omitted the risks, dangers, defects, and disadvantages of the Product, and advertised, promoted, marketed, sold, and distributed the Product as a safe medical device when Defendants knew or should have known that the Product was not safe for its intended purposes and that the Product would cause, and did cause, serious medical problems, and in some patients, including Plaintiff Dianna Lindsay, catastrophic injuries.

43. Contrary to Defendants’ representations and marketing to the medical community and to the patients themselves, the Product has high rates of failure, injury, and complications, fails to perform as intended, requires frequent and often debilitating re-

operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff Dianna Lindsay.

44. The specific nature of the Product's defects includes, but is not limited to, the following:

a. the use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b. the design of the Product to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c. biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d. the use and design of arms and anchors in the Product, which, when placed, are likely to pass through contaminated spaces and can injure major nerve routes in the pelvic region;

e. the propensity of the Product to "creep" or gradually to elongate and deform when subject to prolonged tension inside the body;

///

f. the inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking); and

g. the propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

45. The Product is also defective due to Defendants' failure to adequately warn or instruct Plaintiffs and/or the health care providers of subjects including, but not limited to, the following:

a. the Product's propensities to contract, retract, and/or shrink inside the body;

b. the Product's propensities for degradation, fragmentation and/or creep;

c. the Product's' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d. the rate and manner of mesh erosion or extrusion;

e. the risk of chronic inflammation resulting from the Product;

f. the risk of chronic infections resulting from the Product;

g. the risk of permanent vaginal or pelvic scarring as a result of the Product;

h. the risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i. the need for corrective or revision surgery to adjust or remove the Product;

j. the severity of complications that could arise as a result of implantation of the Product;

k. the hazards associated with the Product;

l. treatment of rectal prolapse with the Product is no more effective than feasible available alternatives;

m. treatment of rectal prolapse with the Product exposes patients to greater risk than feasible available alternatives;

n. treatment of rectal prolapse with the Product makes future surgical repair more difficult than feasible available alternatives;

o. use of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

p. removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

q. complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain.

46. Defendants have underreported information about the propensity of the Product to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the Product through various means and media.

47. Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Product.

48. Defendants failed to design and establish a safe, effective procedure for removal of the Product, or to determine if a safe, effective procedure for removal of the Product exists.

49. Feasible and suitable alternatives to the Product have existed at all times relevant that do not present the same frequency or severity of risks as do the Product.

50. The Product was at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

51. Defendants provided incomplete and insufficient training and information to physicians regarding the use of the Product and the aftercare of patients implanted with the Product.

52. The Product implanted in Plaintiff Dianna Lindsay was in the same or substantially similar condition as it was when it left Defendants' possession, and in the condition directed by and expected by Defendants.

53. The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Product includes, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and

other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain.

54. In many cases, including Plaintiff Dianna Lindsay's, the women have been forced to undergo extensive medical treatment, including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

55. The medical and scientific literature studying the effects of polypropylene mesh, like that of the Product, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Product.

56. Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

57. At all relevant times herein, Defendants continued to promote the Product as safe and effective even when no clinical trials had been done supporting long-term or short-term efficacy.

58. In doing so, Defendants failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Product.

///

///

59. At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiffs and the general public on notice of the dangers and adverse effects caused by implantation of the Product.

60. The Product as designed, manufactured, distributed, sold and/or supplied by Defendants was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

61. As a result of having the Product implanted in her, Plaintiff Dianna Lindsay has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo corrective surgery and hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## FIRST CAUSE OF ACTION

## NEGLIGENCE

62. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

63. Defendants had a duty to individuals, including Plaintiffs, to use reasonable care in designing, manufacturing, marketing, labeling, packaging and selling the Product.

64. Defendants were negligent in failing to use reasonable care as described herein in designing, manufacturing, marketing, labeling, packaging and selling the Product. Defendants breached their aforementioned duty by:

a. Failing to design the Product so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff Dianna Lindsay;

b. Failing to manufacture the Product so as to avoid an unreasonable risk of harm to women in whom the Product was implanted, including Plaintiff Dianna Lindsay;

c. Failing to use reasonable care in the testing of the Product so as to avoid an unreasonable risk of harm to women in whom the Product was implanted, including Plaintiff Dianna Lindsay;

d. Failing to use reasonable care in inspecting the Product so as to avoid an unreasonable risk of harm to women in whom the Product was implanted, including Plaintiff Dianna Lindsay;

e. Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Product.

65. The reasons that Defendants' negligence caused the Product to be unreasonably dangerous and defective include, but are not limited to:

a. the use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

///

///

b. the design of the Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c. biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d. the use and design of arms and anchors in the Product, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e. the propensity of the Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f. the inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation); and

g. the propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

66. Defendants also negligently failed to warn or instruct Plaintiffs and/or health care providers of subjects including, but not limited to, the following:

a. the Product's propensities to contract, retract, and/or shrink inside the body;
b. the Product's propensities for degradation, fragmentation and/or creep;
c. the Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;
d. the rate and manner of mesh erosion or extrusion;
e. The risk of chronic inflammation resulting from the Product;
f. the risk of chronic infections resulting from the Product;
g. the risk of permanent vaginal or pelvic scarring as a result of the Product;
h. the risk of recurrent, intractable pelvic pain and other pain resulting from the Product;
i. the need for corrective or revision surgery to adjust or remove the Product;
j. the severity of complications that could arise as a result of implantation of the Product;
k. the hazards associated with the Product;
l. the Product's defects described herein;
m. treatment of pelvic organ prolapse and stress urinary incontinence with the Product is no more effective than feasible available alternatives;

n. treatment of pelvic organ prolapse and stress urinary incontinence with the Product exposes patients to greater risk than feasible available alternatives;

o. treatment of pelvic organ prolapse and stress urinary incontinence with the Product makes future surgical repair more difficult than feasible available alternatives;

p. use of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q. removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r. complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain.

67. As a direct and proximate result of Defendants' negligence, Plaintiff Dianna Lindsay has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo corrective surgery and hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## SECOND CAUSE OF ACTION

## STRICT LIABILITY – DESIGN DEFECT

68. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

69. The Product implanted in Plaintiff Dianna Lindsay was not reasonably safe for its intended uses and was defective as described herein with respect to its design. As previously stated, the Product's design defects include, but are not limited to:

a. the use of polypropylene material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b. the design of the Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c. biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Products to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d. the use and design of arms and anchors in the Product, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e. the propensity of the Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f. the inelasticity of the Product, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and

causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation); and

g. the propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

70. As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff Dianna Lindsay has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo corrective surgery and hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

71. Defendants are strictly liable to Plaintiffs for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

## THIRD CAUSE OF ACTION

## STRICT LIABILITY – MANUFACTURING DEFECT

72. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

73. The Product implanted in Plaintiff Dianna Lindsay was not reasonably safe for its intended uses and was defective as described herein as a matter of law with respect to its manufacture, in that it deviated materially from Defendants' design and

manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff Dianna Lindsay.

74. As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff Dianna Lindsay has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and corrective surgery and hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

75. Defendants are strictly liable to Plaintiffs for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

## FOURTH CAUSE OF ACTION

## STRICT LIABILITY – FAILURE TO WARN

76. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

77. The Product implanted in Plaintiff Dianna Lindsay was not reasonably safe for its intended uses and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings. Specifically, Defendants did not provide sufficient or adequate warnings regarding, among other subjects:

a. the Product's propensities to contract, retract, and/or shrink inside the body;

b. the Product's propensities for degradation, fragmentation and/or creep;

c. the Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d. the rate and manner of mesh erosion or extrusion;

e. The risk of chronic inflammation resulting from the Product;

f. the risk of chronic infections resulting from the Product;

g. the risk of permanent vaginal or pelvic scarring as a result of the Product;

h. the risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i. the need for corrective or revision surgery to adjust or remove the Product;

j. the severity of complications that could arise as a result of implantation of the Product;

k. the hazards associated with the Product;

l. the Product's defects described herein;

m. treatment of pelvic organ prolapse and stress urinary incontinence with the Product is no more effective than feasible available alternatives;

n. treatment of pelvic organ prolapse and stress urinary incontinence with the Product exposes patients to greater risk than feasible available alternatives;

o. treatment of pelvic organ prolapse and stress urinary incontinence with the Product makes future surgical repair more difficult than feasible available alternatives;

p. use of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q. removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r. complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain.

78. As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff Dianna Lindsay has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo corrective surgery and hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

79. Defendants are strictly liable to Plaintiffs for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

**FIFTH CAUSE OF ACTION**

**BREACH OF EXPRESS WARRANTY**

80. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

///

///

81. Defendants made assurances as described herein to the general public, hospitals and health care professionals that the Product was safe and reasonably fit for their intended purposes.

82. Plaintiffs and/or the healthcare provider chose the Product based upon Defendants' warranties and representations as described herein regarding the safety and fitness of the Product.

83. Plaintiffs, individually and/or by and through physicians, reasonably relied upon Defendants' express warranties and guarantees that the Product was safe, merchantable, and reasonably fit for their intended purposes.

84. Defendants breached these express warranties because the Product implanted in Plaintiff Dianna Lindsay was unreasonably dangerous and defective as described herein and not as Defendants had represented.

85. Defendants' breach of its express warranties resulted in the implantation of unreasonably dangerous and defective products in Plaintiff Dianna Lindsay's body, placing said Plaintiff Dianna Lindsay's health and safety in jeopardy.

86. As a direct and proximate result of Defendants' breach of the aforementioned express warranties, Plaintiff Dianna Lindsay has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo corrective surgery and hospitalization, has suffered

financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

**SIXTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY**

87. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

88. Defendants impliedly warranted that the Product was merchantable and were fit for the ordinary purposes for which it was intended.

89. When the Product was implanted in Plaintiff Dianna Lindsay to treat her rectal prolapse, the Product was being used for the ordinary purposes for which it was intended.

90. Plaintiffs, individually and/or by and through physicians, relied upon Defendants' implied warranties of merchantability in consenting to have the Product implanted in Plaintiff Dianna Lindsay.

91. Defendants breached these implied warranties of merchantability because the Product implanted in Plaintiff Dianna Lindsay was neither merchantable nor suited for its intended uses as warranted.

92. Defendants' breach of its implied warranties resulted in the implantation of unreasonably dangerous and defective products in Plaintiff Dianna Lindsay's body, placing Plaintiff Dianna Lindsay's health and safety in jeopardy.

93. As a direct and proximate result of Defendants' breach of the aforementioned implied warranties, Plaintiff Dianna Lindsay has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo corrective surgery and hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## SEVENTH CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

94. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

95. Defendants' failure to document or follow up on the known defects in its product, and concealment of known defects, constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

96. Defendants are estopped from relying on the statute of limitations defense because Defendants actively concealed the defects, suppressing reports, failing to follow through on FDA notification requirements, and failing to disclose known defects to physicians. Instead of revealing the defects, Defendants continued to represent its Pelvic Mesh Products as safe for their intended use.

///

///

97. Defendants are and were under a continuing duty to disclose the true character, quality, and nature of risks and dangers associated with their Pelvic Mesh Products.

98. Because of Defendants' concealment of the true character, quality and nature of their Pelvic Mesh Products, Defendants are estopped from relying on any statute of limitations defense.

99. Defendants furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs, physicians and the public.

100. Defendants' acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiffs from discovering the injury or cause thereof.

101. Defendants' conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Defendants must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

102. Defendants' conduct, as described in the preceding paragraphs, also amounts to a continuing tort, and continues up through and including the date of the filing of Plaintiffs' Complaint.

## EIGHTH CAUSE OF ACTION

## COMMON LAW FRAUD

103. Plaintiffs incorporate by reference Complaint as if fully set forth herein.

104. Defendants falsely and fraudulently represented and continue to represent to the medical and healthcare community, Plaintiffs, and the public that the Pelvic Mesh Products had been tested and were found to be safe and effective.

105. The representations made by Defendants were, in fact, false. When Defendants made their representations, Defendants knew and/or had reason to know that those representations were false, and Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in their representations and the dangers and health risks to users of the Pelvic Mesh Products.

106. These representations were made by Defendants with the intent of defrauding and deceiving the medical community, Plaintiffs, and the public, and also inducing the medical community, Plaintiffs, and the public, to recommend, prescribe, dispense, and purchase the Pelvic Mesh Products for use as a means of treatment for prolapse, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiffs.

107. In representations to Plaintiffs and/or to Plaintiffs' healthcare providers, Defendants fraudulently concealed and intentionally or recklessly omitted the following material information:

a. That the Defendants' Pelvic Mesh Products were not as safe as other products and procedures available to treat prolapse;

///

b. That the Defendants' Pelvic Mesh Products were more effective than other products and procedures available to treat prolapse;

c. That the risk of adverse events with the Defendants' Pelvic Mesh Products was higher than with other products and procedures available to treat prolapse;

d. The Defendants' Pelvic Mesh Products were not adequately tested;

e. That the limited clinical testing revealed the Defendants' Pelvic Mesh Products had a higher risk of adverse effects, in addition to, and above and beyond those associated with other products and procedures available to treat prolapse;

f. That Defendants deliberately failed to follow up on the adverse results from clinical studies and formal and informal reports from physicians and other healthcare providers and buried and/or misrepresented those findings;

g. That Defendants deliberately chose to forego studies that might reveal the true rate of adverse events or otherwise necessitate the need to reveal information as to adverse events to the Plaintiffs, the medical community, or the regulatory authorities;

h. That Defendants were aware of dangers in the Defendants' Pelvic Mesh Products in addition to and above and beyond those associated with other products and procedures available to treat prolapse;

i. That the Defendants' Pelvic Mesh Products were defective, and that they caused dangerous and adverse side effects, including but not limited to higher incidence of erosion and failure, at a much more significant rate than other products and procedures available to treat prolapse;

j. That patients needed to be monitored more regularly than usual while using the Defendants' Pelvic Mesh Products and that in the event the products needed to be removed that the procedures to remove them had a very high failure rate and/or needed to be performed repeatedly;

k. That the Defendants' Pelvic Mesh Products were manufactured negligently;

l. That the Defendants' Pelvic Mesh Products were manufactured defectively;

m. That the Defendants' Pelvic Mesh Products were designed negligently, and designed defectively; and

n. In the case of the Prolene mesh, that the Defendants' had not sought nor obtained FDA clearance at the time it began marketing and selling the product.

108. Defendants were under a duty to disclose to Plaintiffs and their physicians, the defective nature of the Defendants' Pelvic Mesh Products, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

109. Defendants had sole access to material facts concerning the defective nature of the products and their propensity to cause serious and dangerous side effects and hence,

cause dangerous injuries and damage to persons who used the Defendants' Pelvic Mesh Products.

110. Defendants' concealment and omissions of material fact concerning the safety of the Products were made purposefully, willfully, wantonly, and/or recklessly to mislead, to cause Plaintiff Dianna Lindsay's physicians and healthcare providers to purchase, prescribe, and/or dispense the Pelvic Mesh Products; and/or to mislead Plaintiff Dianna Lindsay into reliance and cause Plaintiff Dianna Lindsay to use the Defendants' Pelvic Mesh Products.

111. At the time these representations were made by Defendants, and at the time Plaintiff Dianna Lindsay used the Pelvic Mesh Products, Plaintiff s were unaware of the falsehood of these representations, and reasonably believed them to be true.

112. Defendants knew and had reason to know that the Defendants' Pelvic Mesh Products could and would cause severe and grievous personal injury to the users of the Defendants' Pelvic Mesh Products, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

113. In reliance upon these false representations, Plaintiffs were induced to, and did use the Pelvic Mesh Products, thereby sustaining severe and permanent personal injuries and damages. Defendants knew or had reason to know that Plaintiffs and their physicians and other healthcare providers had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of

facts surrounding the use of the Defendants' Pelvic Mesh Products, as described in detail herein.

114. Plaintiffs reasonably relied on revealed facts which foreseeably and purposefully suppressed and concealed facts that were critical to understanding the real dangers inherent in the use of the Defendants' Pelvic Mesh Products.

115. Having knowledge based upon Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring Plaintiffs, the public, and Plaintiff Dianna Lindsay 's healthcare providers and physicians, that the Defendants' Pelvic Mesh Products were safe for use as a means of providing relief from prolapse and were as safe or safer than other products and/or procedures available and on the market. As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiffs, and the public at large.

116. Defendants had a duty when disseminating information to the public to disseminate truthful information; and a parallel duty not to deceive the public, Plaintiffs, Plaintiff Dianna Lindsay's healthcare providers, and the FDA.

117. The information distributed to the public, the medical community, the FDA, and Plaintiffs, by Defendants included, but was not limited to websites, information presented at medical and professional meetings, information disseminated by sales

representatives to physicians and other medical care providers, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Defendants’ Pelvic Mesh Products.

118. Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiffs, regarding the safety of the Defendants’ Pelvic Mesh Products specifically that the Products did not have dangerous and/or serious adverse health safety concerns, and that the Defendants’ Pelvic Mesh Products were as safe or safer than other means of treating prolapse.

119. Defendants intentionally failed to inform the public, including Plaintiffs, of the high failure rate including erosion, the difficulty or impossibility of removing the mesh, and the risk of permanent injury.

120. Defendants chose to over-promote the purported safety, efficacy and benefits of the Defendants’ Pelvic Mesh Products instead.

121. Defendants’ intent and purpose in making these misrepresentations was to deceive and defraud the public, the medical community, and Plaintiffs; to gain the confidence of the public, the medical community, and Plaintiffs; to falsely assure them of the quality and fitness for use of the Products; and induce Plaintiffs, the public and the

medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Defendants' Pelvic Mesh Products.

122. Defendants made claims and representations in its documents submitted to the FDA and its reports to the public and to healthcare professionals and in advertisements that the Defendants' Pelvic Mesh Products had innovative beneficial properties and did not present serious health risks.

123. These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

124. These representations, and others made by Defendants, were made with the intention of deceiving and defrauding Plaintiffs, Plaintiff Dianna Lindsay's healthcare professionals and other members of the healthcare community, and were made in order to induce Plaintiffs, and their respective healthcare professionals, to rely on misrepresentations, and caused Plaintiffs to purchase, rely, use, and request the Defendants' Pelvic Mesh Products and their healthcare professionals to dispense, recommend, or prescribe the Defendants' Pelvic Mesh Products.

125. Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Defendants' Pelvic Mesh Products to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and/or not as safe as other alternatives.

126. Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations, for the purpose of deceiving and lulling Plaintiffs, as well as their healthcare professionals, into a false sense of security, so that Plaintiffs and their healthcare providers would rely on Defendants' representations, and Plaintiffs would request and purchase the Defendants' Pelvic Mesh Products, and that their healthcare providers would dispense, prescribe, and recommend the Defendants' Pelvic Mesh Products.

127. Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Defendants' Pelvic Mesh Products.

128. At the time the representations were made, Plaintiffs and their healthcare providers did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Defendants' Pelvic Mesh Products. Plaintiffs did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiffs discover the false representations of Defendants, nor would Plaintiffs with reasonable diligence have discovered the true facts or Defendant's misrepresentations.

129. Had Plaintiffs known the true facts about the dangers and serious health and/or safety risks of the Defendants' Pelvic Mesh Products, Plaintiffs would not have purchased, used, or relied on Defendants' Pelvic Mesh Products.

130. Defendants' wrongful conduct constitutes fraud and deceit, and was committed and perpetrated willfully, wantonly, and/or purposefully on Plaintiffs.

131. As a direct and proximate result of Defendants' conduct, Plaintiff Dianna Lindsay experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo future medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

**NINTH CAUSE OF ACTION**

**FRAUDULENT CONCEALMENT**

132. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

133. Plaintiffs bring this fraudulent concealment claim under the common law.

134. Throughout the relevant time period, Defendants knew that their Pelvic Mesh Products were defective and unreasonably unsafe for their intended purpose.

135. Defendants fraudulently concealed from and/or failed to disclose to or warn Plaintiffs, their physicians and the medical community that their Pelvic Mesh Products were defective, unsafe, and unfit for the purposes intended, and that they were not of merchantable quality.

136. Defendants were under a duty to Plaintiffs to disclose and warn of the defective nature of the Products because:

///

a. Defendants were in a superior position to know the true quality, safety and efficacy of the Defendants' Pelvic Mesh Products;

b. Defendants knowingly made false claims about the safety and quality of the Defendants' Pelvic Mesh Products in the documents and marketing materials Defendants provided to the FDA, physicians, and the general public; and

c. Defendants fraudulently and affirmatively concealed the defective nature of the Defendants' Pelvic Mesh Products from Plaintiffs.

137. The facts concealed and/or not disclosed by Defendants to Plaintiffs were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use the Defendants' Pelvic Mesh Products.

138. Defendants intentionally concealed and/or failed to disclose the true defective nature of the Products so that Plaintiffs would request and purchase the Defendants' Pelvic Mesh Products, and that healthcare providers would dispense, prescribe, and recommend the Defendants' Pelvic Mesh Products, and Plaintiffs justifiably acted or relied upon, to her detriment, the concealed and/or non-disclosed facts as evidenced by her purchase of the Defendants' Pelvic Mesh Products.

139. Defendants, by concealment or other action, intentionally prevented Plaintiffs and Plaintiffs' physicians and other healthcare providers from acquiring material information regarding the lack of safety and effectiveness of the Defendants' Pelvic Mesh Products, and are subject to the same liability to Plaintiffs for Plaintiffs' pecuniary losses,

as though Defendants had stated the non-existence of such material information regarding the Defendants' Pelvic Mesh Products' lack of safety and effectiveness and dangers and defects, and as though Defendants had affirmatively stated the non-existence of such matters that Plaintiffs were thus prevented from discovering the truth. Defendants therefore have liability for fraudulent concealment under all applicable law, including, inter alia, Restatement (Second) of Torts § 550 (1977).

140. As a proximate result of the Defendants' conduct, Plaintiffs have been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

**TENTH CAUSE OF ACTION**

**CONSTRUCTIVE FRAUD**

141. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

142. Defendants are in a unique position of knowledge concerning the quality, safety and efficacy of the Defendants' Pelvic Mesh Products, which knowledge is not possessed by Plaintiffs or their physicians, and Defendants thereby hold a position of superiority over Plaintiffs and their physicians.

143. Despite their unique and superior knowledge regarding the defective nature of the Defendants' Pelvic Mesh Products, Defendants continue to suppress, conceal, omit, and/or misrepresent information to Plaintiffs, the medical community, and/or the FDA,

concerning the severity of risks and the dangers inherent in the intended use of the Defendants' Pelvic Mesh Products, as compared to other products and forms of treatment.

144. For example, scientists in the recent study published in Obstetrics & Gynecology, August, 2010, found that the complication rate was so high that the clinical trial was halted early.

145. Defendants have concealed and suppressed material information, including limited clinical testing, that would reveal that the Defendants' Pelvic Mesh Products had a higher risk of adverse effects, in addition to, and exceeding those associated with alternative procedures and available devices. Instead, Defendants have misrepresented the safety and efficacy of the Products.

146. Upon information and belief, Defendants' misrepresentations are designed to induce physicians and Plaintiffs to prescribe, dispense, recommend and/or purchase the Defendants' Pelvic Mesh Products. Plaintiffs and the medical community have relied upon Defendants' representations.

147. Defendants took unconscionable advantage of their dominant position of knowledge with regard to Plaintiffs and their medical providers and engaged in constructive fraud in their relationship with Plaintiffs and their medical providers. Plaintiffs reasonably relied on Defendants' representations.

///

///

148. As a proximate result of the Defendants' conduct, Plaintiffs have been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

**ELEVENTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

149. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

150. Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiffs, and the public, that the Pelvic Mesh Products had not been adequately tested and found to be safe and effective for the treatment of prolapse. The representations made by Defendants, in fact, were false.

151. Defendants failed to exercise ordinary care in the representations concerning the Pelvic Mesh Products while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the Pelvic Mesh Products' high risk of unreasonable, dangerous, adverse side effects.

152. Defendants breached their duty in representing that the Defendants' Pelvic Mesh Products have no serious side effects different from older generations of similar products and/or procedures to Plaintiffs, Plaintiffs' physicians, and the medical and healthcare community.

153. As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the Pelvic Mesh Products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that they created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, erosion, pain and suffering, surgery to remove the products, and other severe and personal injuries, which are permanent and lasting in nature.

154. As a direct and proximate result of the Defendants' conduct, Plaintiffs have been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

## TWELFTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

155. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

156. Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed and sold the Defendants' Pelvic Mesh Products to Plaintiffs, carelessly and negligently concealing the harmful effects of the Defendants' Pelvic Mesh Products from Plaintiffs, and carelessly and negligently misrepresented the quality, safety and efficacy of the products.

157. Plaintiffs were directly impacted by Defendants' carelessness and negligence, in that Plaintiffs have sustained and will continue to sustain emotional distress, severe physical injuries and/or death, economic losses, and other damages as a direct result of the decision to purchase the Pelvic Mesh Products sold and distributed by Defendants.

158. As a direct and proximate result of the Defendants' conduct, Plaintiffs have been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

## THIRTEENTH CAUSE OF ACTION

## VIOLATION OF CONSUMER PROTECTION LAWS

159. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

160. Plaintiffs purchased and used the Defendants' Pelvic Mesh Products primarily for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

161. Had Defendants not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased and/or paid for the Defendants' Pelvic Mesh Products, and would not have incurred related medical costs and injury.

162. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiffs for the Pelvic Mesh Products that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

163. Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

a. Representing that goods or services have characteristics, ingredients, uses benefits or quantities that they do not have;

b. Advertising goods or services with the intent not to sell them as advertised; and

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

164. Plaintiffs were injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create demand for and sell the Defendants' Pelvic Mesh Products. Each aspect of Defendants' conduct combined to artificially create sales of the Defendants' Pelvic Mesh Products.

165. Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Defendants' Pelvic Mesh Products.

166. Had Defendants not engaged in the deceptive conduct described above, Plaintiffs would not have purchased and/or paid for the Products, and would not have incurred related medical costs.

167. Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiffs, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed below.

168. Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes, as listed below.

169. Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of the statutory provisions of the State of California.

170. Under the applicable statutes to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

171. Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that the Defendants' Pelvic Mesh Products were fit to be used for the purpose for which they were intended,

when in fact they were defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

172. The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

173. Defendants had actual knowledge of the defective and dangerous condition of the Defendants' Pelvic Mesh Products and failed to take any action to cure such defective and dangerous conditions.

174. Plaintiffs and the medical community relied upon Defendants' misrepresentations and omissions in determining which product and/or procedure to undergo and/or perform (if any).

175. Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

176. By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiffs have suffered ascertainable losses and damages.

177. As a direct and proximate result of Defendants' violations of the state's consumer protection laws, Plaintiffs have sustained economic losses, injuries and other

damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

**FOURTEENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

178. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

179. Defendants are and at all times relevant were the manufacturers, sellers, and/or suppliers of the Defendants' Pelvic Mesh Products.

180. Plaintiffs paid for the Defendants' Pelvic Mesh Products for the purpose of treatment of prolapse or other similar conditions.

181. Defendants have accepted payment by Plaintiffs and others on Plaintiffs' behalf for the purchase of the Defendants' Pelvic Mesh Products.

182. Plaintiffs have not received the safe and effective medical devices for which they paid.

183. It would be inequitable for Defendants to keep this money since Plaintiffs did not in fact receive a safe and effective medical device as represented by Defendants.

**FIFTEENTH CAUSE OF ACTION**

**LOSS OF CONSORTIUM**

184. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

185. As a direct and proximate result of the above-described injuries sustained by Plaintiff Dianna Lindsay, her husband, Plaintiff Robert Lindsay, has suffered a loss of his wife's consortium, companionship, society, affection, services and support.

## DISCOVERY RULE AND TOLLING

186. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

187. Plaintiffs assert all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

188. Plaintiffs plead that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

189. Despite diligent investigation by Plaintiffs into the cause of their injuries, including consultations with Plaintiffs' medical providers, the nature of Plaintiffs' injuries and damages, and their relationship to the Products was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims. Therefore, under appropriate

application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period.

190. The running of the statute of limitations in this cause is tolled due to equitable tolling. Defendant(s) are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiffs and Plaintiffs' physicians of the true risks associated with the Products. As a result of Defendants' fraudulent concealment, Plaintiffs and Plaintiffs' physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

**PUNITIVE DAMAGES**

191. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

192. Defendants sold the Product to Plaintiff Dianna Lindsay's healthcare providers and other healthcare providers in California and throughout the United States without doing adequate testing to ensure that the Product was reasonably safe for implantation in the female pelvic area.

193. Defendants sold the Product to Plaintiff Dianna Lindsay's health care providers and other health care providers in California and throughout the United States in spite of their knowledge that the Product can shrink and/or degrade inside the body,

thereby causing severe and debilitating injuries suffered by Plaintiff Dianna Lindsay and numerous other women.

194. Defendants ignored reports from patients and health care providers throughout the United States and elsewhere of the Product's failures to perform as intended, which lead to the severe and debilitating injuries suffered by Plaintiff Dianna Lindsay and numerous other women. Rather than doing adequate testing to determine the cause of these injuries, or to rule out the Product's designs or the processes by which the Product is manufactured as the cause of these injuries, Defendants chose instead to continue to market and sell the Product as safe and effective.

195. Defendants knew the Product was unreasonably dangerous in light of their risks of failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the Product, as well as other severe and personal injuries which were permanent and lasting in nature.

196. Defendants withheld material information from the medical community and the public in general, including Plaintiffs, regarding the safety and efficacy of the Product.

197. Defendants knew and recklessly disregarded the fact that the Product caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat rectal prolapse.

198. Defendants misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the Product.

199. Notwithstanding the foregoing, Defendants continue to aggressively market the Product to consumers, without disclosing the true risks associated with the Product.

200. Defendants knew of the Product's defective and unreasonably dangerous nature, but continued to manufacture, market, distribute, and sell the Product so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiffs.

201. Defendants continue to conceal and/or fail to disclose to the public, including Plaintiffs, the serious complications associated with the use of the Products to ensure continued and increased sales of the Products.

202. Defendants' conduct was willful and a conscious disregard for the safety of women, generally, and Plaintiffs specifically.

203. Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a trial by jury and judgment against Defendants for:

1. Compensatory damages to Plaintiffs for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiffs, health and medical care costs, together with interest and costs as provided by law;

2. Restitution and disgorgement of profits;

3. Reasonable attorneys' fees;

4. The costs of these proceedings;

5. All ascertainable economic damages;

6. Punitive damages;

7. Such other and further relief as this Court deems just and proper.

Dated: July 12, 2013

JEFFREY A. LAKE, A.P.C.

By: Nathan A. Shaman
Nathan A. Shaman, Esq
Attorneys for Plaintiffs Diana Lindsay and Robert Lindsay

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Dianna Lindsay and Robert Lindsay

**DEFENDANTS**
Johnson and Johnson, Ethicon, Inc., and Ethicon, LLC

**(b)** County of Residence of First Listed Plaintiff: San Diego, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Middlesex County, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Nathan A. Shaman, Esq. (SBN 272928)
JEFFREY A. LAKE, A.P.C.
11650 Iberia Place, Suite 130, San Diego, CA 92128

Attorneys *(If Known)*

'13CV1639 JLS BGS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❒ 1 U.S. Government Plaintiff
- ❒ 3 Federal Question *(U.S. Government Not a Party)*
- ❒ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❒ 1 | Incorporated *or* Principal Place of Business In This State | ❒ 4 | ❒ 4 |
| Citizen of Another State | ❒ 2 | ❒ 2 | Incorporated *and* Principal Place of Business In Another State | ❒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❒ 3 | ❒ 3 | Foreign Nation | ❒ 6 | ❒ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ❒ 110 Insurance
- ❒ 120 Marine
- ❒ 130 Miller Act
- ❒ 140 Negotiable Instrument
- ❒ 150 Recovery of Overpayment & Enforcement of Judgment
- ❒ 151 Medicare Act
- ❒ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ❒ 153 Recovery of Overpayment of Veteran's Benefits
- ❒ 160 Stockholders' Suits
- ❒ 190 Other Contract
- ❒ 195 Contract Product Liability
- ❒ 196 Franchise

**REAL PROPERTY**
- ❒ 210 Land Condemnation
- ❒ 220 Foreclosure
- ❒ 230 Rent Lease & Ejectment
- ❒ 240 Torts to Land
- ❒ 245 Tort Product Liability
- ❒ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
- ❒ 310 Airplane
- ❒ 315 Airplane Product Liability
- ❒ 320 Assault, Libel & Slander
- ❒ 330 Federal Employers' Liability
- ❒ 340 Marine
- ❒ 345 Marine Product Liability
- ❒ 350 Motor Vehicle
- ❒ 355 Motor Vehicle Product Liability
- ❒ 360 Other Personal Injury
- ❒ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ❒ 365 Personal Injury - Product Liability
- ☒ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ❒ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ❒ 370 Other Fraud
- ❒ 371 Truth in Lending
- ❒ 380 Other Personal Property Damage
- ❒ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ❒ 440 Other Civil Rights
- ❒ 441 Voting
- ❒ 442 Employment
- ❒ 443 Housing/ Accommodations
- ❒ 445 Amer. w/Disabilities - Employment
- ❒ 446 Amer. w/Disabilities - Other
- ❒ 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- ❒ 463 Alien Detainee
- ❒ 510 Motions to Vacate Sentence
- ❒ 530 General
- ❒ 535 Death Penalty

**Other:**
- ❒ 540 Mandamus & Other
- ❒ 550 Civil Rights
- ❒ 555 Prison Condition
- ❒ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ❒ 625 Drug Related Seizure of Property 21 USC 881
- ❒ 690 Other

**LABOR**
- ❒ 710 Fair Labor Standards Act
- ❒ 720 Labor/Management Relations
- ❒ 740 Railway Labor Act
- ❒ 751 Family and Medical Leave Act
- ❒ 790 Other Labor Litigation
- ❒ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ❒ 462 Naturalization Application
- ❒ 465 Other Immigration Actions

**BANKRUPTCY**
- ❒ 422 Appeal 28 USC 158
- ❒ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ❒ 820 Copyrights
- ❒ 830 Patent
- ❒ 840 Trademark

**SOCIAL SECURITY**
- ❒ 861 HIA (1395ff)
- ❒ 862 Black Lung (923)
- ❒ 863 DIWC/DIWW (405(g))
- ❒ 864 SSID Title XVI
- ❒ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ❒ 870 Taxes (U.S. Plaintiff or Defendant)
- ❒ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ❒ 375 False Claims Act
- ❒ 400 State Reapportionment
- ❒ 410 Antitrust
- ❒ 430 Banks and Banking
- ❒ 450 Commerce
- ❒ 460 Deportation
- ❒ 470 Racketeer Influenced and Corrupt Organizations
- ❒ 480 Consumer Credit
- ❒ 490 Cable/Sat TV
- ❒ 850 Securities/Commodities/ Exchange
- ❒ 890 Other Statutory Actions
- ❒ 891 Agricultural Acts
- ❒ 893 Environmental Matters
- ❒ 895 Freedom of Information Act
- ❒ 896 Arbitration
- ❒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ❒ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❒ 2 Removed from State Court
- ❒ 3 Remanded from Appellate Court
- ❒ 4 Reinstated or Reopened
- ❒ 5 Transferred from Another District *(specify)*
- ❒ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
28 U.S.C. section 1332

Brief description of cause:
Product Liability for defective medical device

## VII. REQUESTED IN COMPLAINT:

❒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ❒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE DOCKET NUMBER

DATE
07/12/2013

SIGNATURE OF ATTORNEY OF RECORD
s/ Nathan A. Shaman

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE